when you are ready, and the Court wants to acknowledge and thank you for your service as appointed counsel under the Criminal Justice Act. Thank you, Your Honor. May it please the Court, Mr. Calderman. Carlocito Slim is a member of the Navajo Indian Nation, and he and his family came up to work on the cement plant in Rapid City, South Dakota. They're iron workers. They worked for an independent contractor that did, they were refurbishing the cement plant there. And when they came up here, they, the facts of this case are very important. And so I'm going to kind of start from the beginning here and talk about the evidence in this case that the conviction was based on. Most of my argument is going to be on the facts of this case. The, because the probable cause and the weight of the evidence, I think, affects the arguments that I also made on the motion to suppress and the motion to dismiss for lack of probable cause to make an arrest in this case. But anyway, so Slim comes up here, and he's with his brother, two sisters, five kids, and a brother-in-law. And he starts working at the, at the cement plant and injures his back. And so his sister, Kimmy, tried to, you know, doctor him up with Bengay and stuff like that. Finally, she told him to go get a massage. He talked to his mother, who lived in Arizona, and she talked to him and said, you know, you should go get a massage or go to a doctor or do something. So ‑‑ Counsel, can I ask you this? And I don't mean to interrupt, but one of the, that implicates one of the key arguments you make, which is I think that this is just a case where you can't bring a condom to a massage. You know, Your Honor, I think that that was what they said for him to bring. That was later, that was the next day, not the first day. So I think it's important to, when you think of, consider in this case, I mean, so he, so he, you know, has a gun. He can't bring a condom to a massage. He, somebody tells him, a co-worker says, go to Backpage, you can get, you know, you can get a massage. Okay. That's on August 9th. And he says, that's the first thing he asks. He doesn't ask about whether or not the girl is 16 or whether they're going to engage in any funny stuff or illegal stuff. He says, are you available? Do you offer a massage? And, and nothing is said. And then he calls back, you know, half an hour, 35 minutes later, are you available? He didn't say about anything about sex. And then at 1047, the, Mr. Russell, the agent in this case, who, posing as a fictitious, non-existent victim, said, you know, we have this, you know, this girl is fresh as hell. She's going to be 16. We'll do almost nothing. Well, I mean, this guy is talking about a massage. You're not talking about, you know, a 15, 16-year-old girl. He was interrogated. He said a number of times, if you read his interrogation, you will see that there was a constant back and forth between him and Russell. She said 14, going on 15. He says, yeah, but you also said she was 20. I mean, I wanted a massage. I didn't want an underage girl. And so that was kind of a, that was a kind of the, the descriptive behavior, at least a description of the interrogation that took place. And he thought it was a massage and he needed to bring a condom for the massage. And there was some other language about that. But that was, the other guy thought he wanted something different. You know, he, okay, so 15 or 16, you know, I mean, that could be a, that could, there's nothing to say what that was for. I mean, that could be, that could be a massage. That's what he thought it was. Because, and what does he say? Right that first day that we're talking about, right after that, he says, okay, I would like to see her first, you know. And at 1055, they don't answer, so he calls again. And the purpose of that was because they weren't answering him about seeing the girl, he wanted to follow up on that. So that was the end of the first day, all right. Thirteen hours later, thirteen hours later, he calls up and says, can I do, how about tonight at nine? Well, that's consistent with the massage. There's nothing that says any sex or any sexual overtones of that. And Russell says, okay, I'll get you up there later with a location. So, thirteen hours later, the next day, and Slim said during his interrogation, he didn't know if he was talking to the same person the second day as he was talking in the first day. So then they set this up, and then he says, you know, twenty hours later, this guy runs up to him and says, you know, I'd like to see you today. Russell, who is the agent, says, okay, bro, you have to have a rock, you have to rock a condom, because beer costs extra. That's chat lingo. This guy, in the trial of this case, we introduced this young man's school records. He was in special education since he was 13 years, or in special education almost all of his life. Those are in the record. He had problems comprehending and interpreting certain things, and his mother testified that, Barbara Dern. She testified about that, and about his learning disabilities. So, and he, this guy had never, had never been in a relationship with a woman. He had never been involved in this before. He didn't know what rock, who knows what rock a condom? I wouldn't know that, you know. What about the location, though? I mean, you know, I think it happened, the meet was at a truck stop, and that, again, I kind of suggest that maybe, maybe it's not really a massage, because you don't usually get massages in the car, or you don't meet at a truck stop for a massage. Here's the deal. They say, Russell says, okay, meet me out there, and we'll go to the room. Okay? Go to the room, go to the room, you could do a lot of things in a room, one of which is a massage. So he didn't have any reason to believe that that was, you know, illegal. The other thing is, he went out there, okay? He had the condom in the car. The testimony at the trial was that these people, his two sisters, his brother, and his father, and his brother-in-law, plus five kids lived in a trailer house. They had one car to go to work in, and there's pictures of this car, because that was a car that he was, that was searched out there, but his, I called his brother, Elliot, and he testified that he used the car to socialize. He was in the car. So that was the explanation for the condoms in the car. The history of this, him being there, having his back hurt, that was not disputed at trial at all, his school records in this thing, the interrogation that took place. Now, it's interesting in this case. Russell said, lookit, this is during a Sturgis bike rally. I mean, there's a lot of people in the Rapid City area at the Sturgis bike. He says, we were doing these projects, I call them, and he said, we didn't have a lot of, we didn't have the manpower that we needed. Now, that's important, because normally when they do these, Russell said, lookit, we usually have a, we go talk to the guy first, but we didn't have a chance to do this here, but if we have a chance to talk to him, we can determine whether or not, you know, this is really what he wants. And there was, so, and I asked Russell, I said, well, was he penalized for that? Russell says, well, sure, he was penalized, but I didn't get to talk to him. Now, he didn't say, you know, Russell still, you know, made the arrest and was the chief prosecutor in his case, but at any rate, you know, he did say that that was the case. He never did let, they never did let him see the girl. Russell indicated that, you know, this, if you look at the girl, if you look at this initial page that he responded to, this girl looks like she could be 20 years old. Russell admitted that. He says, yeah, you could look at that, and I suppose one could come to the conclusion that she's 20 years old. Well, if she's 20 years old and you have a good, you know, you have a good faith fact showing that, you know, you, that was the case, then you don't have any case under the statutes that she was indicted for because they have to be below 18 years old. So, you know, it's a little more age. Anything over 20 is, you know, it may be illegal as a prostitution or something else, but it certainly isn't a violation of 1591 or 2411 in this case. O'Connor. Mr. Pichot, I'd like to ask you about the warrantless search of the vehicle. Okay. And the reasoning for that. Do you know whether an inventory was ever actually taken of the context, of the contents of slavery? No. There was never an inventory. They say, the government said, when that was raised, the only thing they said was that, well, we have a procedure. This is the procedure that we use. There was never an inventory that was taken, listing everything in that car. Because if you look at that car and you look at those pictures, there would have been five or six pages because that car was just packed with tools that they used and everything else. And so when that became an issue, then they come up with a piece of paper that just listed the three things that they seized or three or four things that they seized in this case. There was nothing in there about an inventory. I mean, there was not an inventory of that car. There was a list. There was not any policies or procedures on this inventory, Judge. There was just a testimony from these guys saying, yeah, well, this is the practice or procedure that we go through, you know. Thank you. Would you like to save the rest of your time for rebuttal? Yes, I'll do that, Your Honor. Thank you. Thank you. Mr. Kelderman, you may proceed. Thank you, Your Honor. May it please the Court and Counsel. The last thing Mr. Pachoda talked about was lack of inventory, and I'm going to direct the Court's attention to the District Court docket. It's docket 88-1. It was attached to the United States response. At the suppression hearing, the United States did not present the inventory, then supplemented the record afterward, and I believe it was done without objection from defense counsel. The evidence inventory and receipt lists things taken from the person of Carlosito Slim, U.S. currency. It lists items that were seized as an iPhone, a Trojan condom, two $100 bills, a track phone, and a box of Trojan condoms. And then it lists, as other items from the vehicle, miscellaneous papers, clothing, child seat tools, shoes, backpack, jeans, jacket, and two hard hats. There wasn't inventory done at the time, and it was produced in support of, I guess, the... It was done contemporaneously or after the time? It's dated. It is dated from the date of the seizure. The hours, it's signed by Holly Strand, who's a law enforcement person, so, yeah, everything about it says that it was taken at the time. It's just that it didn't come until much later. Correct, Your Honor. At the suppression hearing, the United States had agents, supervisory special agent Brent Gromer, and Detective Jeremy Stoffaker discussed the procedures with the South Dakota Division of Criminal Investigation, Rapid City PD, Pennington County Sheriff's Office. The procedures were discussed. It's just that the documents showing the inventory were not submitted at that time. As to the evidence, Judge Strauss, you were pointing out a number of things that I also was going to point out. This ad was posted, and it says, Who Wants to be Naughty 20? It says nothing about a massage. The massage came up when the defendant, when Carlosito Slim, said, How are you available, and do you offer massage? The conversation then goes on. But in the first response, the first thing that he gets from Special Agent Russell was, This girl is fresh as hell. She's 15, going to be 16, will do most anything. $150 for a half hour, $200 for a full hour. Very expensive price for a massage. But that notwithstanding, the defendant says he wants to see her, and then the conversation ends for the night. The next day, he re-initiates the conversation, and he's told very early on, they want to meet at 9 o'clock, but then he's told that he has to rock a condom, because bare is extra. He says, Okay, sounds good. Then he is told, You can't scare her. You can't hurt her. I can't have her bruised. And he says, Nothing like that. I get it, bro. The next day, he says, Okay, sounds good. Then the meeting is set up at a truck stop, not at a business location. Nowhere in these text messages does massage come up again. Nowhere in there does he say, I've got a back injury. Please bring your table. Where are we going to set up? Where is your shop? Why do we need to meet at a truck stop? Anything like that. Everything about this. Everything about this situation screamed sex with a minor. Nothing about it said massage, other than the one time where he brought it up at the beginning. I didn't recall that from the record. Was there some conversation about a room? To be fair, there are in-home massages or in-room massages that you get as well. I'm looking at Exhibit 64 on the second page, I believe. Then you can follow me to the room. What are you driving? White Chevrolet is the response. All of the conversations are going on, on cell phones. He goes to the exact spot. At the Flying J, there's a large sign. And lower on the sign where it says Flying J at the top, lower it says Country Market. I believe it's the restaurant inside the truck stop. Meet at the Country Market sign, and he goes exactly there. They find his car and they see him. He sets there for a little while, and then he moves over toward a different place in the restaurant. They go over to find him. And in the vehicle, they find him, in the white vehicle, of course. And they find exactly $200. And they find the condom right there. I believe they were right on the seat of the vehicle. The standard for upholding or reversing a conviction is whether any reasonable, the reasonable inferences about the verdict are drawn in favor of the non-moving party. So we have a court trial, and the district court's verdict is entitled to the same deference as a jury verdict. And the district court here concluded that the evidence showed beyond a reasonable doubt that the defendant went there. He went there with the intent to have sex with a person, that he brought condoms, and that he was communicating with a pimp. He was not communicating with a masseuse. Again, the prices were listed. They were discussed. From the very beginning, it was clear that this person that was being offered was 15 years old, going on 16, and was fresh as hell. Special Agent Russell, and I believe also Special Agent Gromer, they both discussed the lingo, the language that's used in this. They're experienced, and they work with the Internet Crimes Against Children Task Force. They know the language that's used in these conversations on websites like this, and they explained the fresh as hell means, the fresh means that it's a young person. It's lingo in that realm. Sotomayor was it all of the specialized language that was used, used by the law enforcement, not by the defendant? I'll confirm that as I look at it here in a moment, Your Honor. You may very well be correct, but the defendant responded. Mr. Slim responded, I don't know if the word would be appropriately, but he responded with an understanding. He knew what was going on. He even confirmed in his interview later, when Special Agent Russell interviewed him at the Homeland Security Investigations Office, he confirmed that he was going there, and he thought he was going to get some. He also confirmed on page 270, I believe, of the trial transcript during cross-examination, that he understood 15 going on 16, or going to be 16. He understood what that meant. I believe that it is, other than the use of the word massage, which is common on Backpage, and Special Agent Russell, testified about that as well. Ultimately, isn't all that really matters what a reasonable jury can conclude? Yes, or hear a reasonable court. I agree, Your Honor. These are factual issues that were resolved against Mr. Slim, and so they are entitled to that deference under the standard that this Court has repeated when reviewing the sufficiency of the evidence numerous times, very many times. Counsel, I had a question about the fictitious victim issue, with the fact that there was no real 15 or 16-year-old girl. We recently had the same issue, I believe, in a case called Rajab, Rajab? Rahab. Rahab, there you go. I sat on the case, so I should probably know what the name is, or how to pronounce it. But do you think that's controlling here? We don't need to go to Rule 12. You made a Rule 12 argument. I think we can just rely on that case. Absolutely, Your Honor. The reason that it's not cited in my brief is that I argued Rahab as well. It was decided after this brief came out, but I believe that the authority was some longstanding authority that even preceded Rahab. But I agree that it is controlled by that. Your Honor, everything about the search of the vehicle was justified as a search incident to arrest, and also as an inventory search. The evidence was more than sufficient, given the nature of the conversations, given the full text of the conversations outlined in Exhibit 64. And the fact that it began with, who wants to be naughty? It's clear that this was a sexual conversation, and the United States is entitled to the inferences to be drawn from the district court's verdict. The United States admits that the probable cause issue was something that should have been raised earlier in the litigation, and was not. And that is something where the court can refuse to look into it under the prevailing case law, because it was not raised in the district court, or the Rule 12 motion. The United States believes that everything was done properly in this case, and the verdict was rendered according to more than sufficient evidence. The United States asks that the court affirm the conviction and everything attendant thereto. And I ask that the court approve the convictions for the two counts in all respects. Thank you. Mr. Pecotta, you may proceed with rebuttal. I just have a few comments, Your Honor. Thank you. With regard to the contention that this thing got started, this conversation got started, and sex was first brought up, first of all, when the court said, you know, do you want to be naughty? When he called, however, the first thing that he said was, look at, are you available for a massage, and how much, or something like that. So, I mean, that was not a sexual conversation right off of the bat. And then the next thing on that first day, you know, fresh as hell, we'll do anything. Do anything? Well, that includes a massage, so you could think that, you know, and he continues to say, look, the ad said 20 years old. Then you start, why don't you write an opinion that draws a big red line, okay? Red line. You can't say that somebody's one age, and then get these people in these conversations, and then you mention that they're 14 or 15, then what's the person supposed to believe? I mean, that seems to me to be an underhanded law enforcement, you know, project, really, and shouldn't be allowed at all, because, or it should be held against them, when they're now trying to say that they were, you know, 14 or 15. They were 15 or, they were below 18. The interrogation that took place at page 23, and that's part of the record in the case, and here's how this conversation went. Okay, 20, though, saying it said 20, so that's kind of like I thought she was 20. Toby Russell says, yeah, but in the conversation, I said 15. Carlisto soon says, but you can't do that, though. When you say it's 20, she was 20, and he says, I'm not disputing that, and then Carlisto starts to say, and I'm not saying, I don't know what he was, but he was not allowed, at that instance or any other instances, to say what, you know, that person said. He did not believe that this girl was under the age of 18, or he did not believe that the person he was talking to the second day, 20 hours later, was the same person he was talking about in the first place. Your time has expired.